Luis VARGAS–SARMIENTO
Petitioner,

v.

**UNITED STATES DEPARTMENT OF JUSTICE, Bureau of Citizenship and Immigration Services, Respondents.**

Docket No. 04–0241–AG.

United States Court of Appeals,
Second Circuit.

Argued: Dec. 14, 2005.

Decided: May 8, 2006.

Andrew L. Friedman, Wilens & Baker, P.C., New York, New York, for Petitioner.

Michael R. Holden, Assistant United States Attorney (Sara L. Shudofsky, Assistant United States Attorney, on the brief) for David N. Kelley, United States Attorney for the Southern District of New York, New York, New York, for Respondent.

Before: CALABRESI, KATZMANN, and RAGGI, Circuit Judges.

Judge CALABRESI concurs in a separate opinion.

REENA RAGGI, Circuit Judge:

Luis Vargas–Sarmiento ("Vargas") petitions pursuant to 8 U.S.C. § 1252(a) (2000), for review of a January 2, 2004 order of the Board of Immigration Appeals ("BIA"), upholding a May 13, 1998 ruling by an Immigration Judge ("IJ") ordering Vargas removed from the United States as an alien convicted of an "aggravated felony." 8 U.S.C. § 1227(a)(2)(A)(iii). To avoid the general jurisdictional bar to any such judicial review, see id. §§ 1252(a)(2)(C) and (D), Vargas contends that the BIA erred in holding that his 1984 New York State conviction for first-degree manslaughter, see N.Y. Penal Law· § 125.20, constitutes a "crime of violence" under 18 U.S.C. § 16(b) and, therefore, an "aggravated felony" as defined in 8 U.S.C. § 1101(a)(43)(F). For the reasons stated

in this opinion, we conclude that first-degree manslaughter under subsections (1) or (2) of N.Y. Penal Law § 125.20 does constitute a crime of violence within the meaning of 18 U.S.C. § 16(b) and an aggravated felony under 8 U.S.C. § 1101(a)(43)(F). Because the BIA correctly identified Vargas as an alien convicted of an aggravated felony, we lack jurisdiction to review further the order of removal in the case. Accordingly, we dismiss Vargas's petition for review of the order of removal.

## I. *Background*

### A. *Vargas's 1984 Manslaughter Conviction*

Vargas, a citizen of Peru, entered the United States on or about July 7, 1976, as a non-immigrant visitor and, on February 1, 1983, acquired lawful permanent resident status. A few months earlier, in October 1982, Vargas was arrested by New York State authorities and indicted for second-degree murder in connection with the stabbing death of his girlfriend, Miriam M. Molina. *See* N.Y. Penal Law § 125.25(1). In May 1984, a Kings County jury found Vargas guilty of the lesser-included offense of first-degree manslaughter without returning a verdict on the second-degree murder charge. *See id.* § 125.20; *Sellan v. Kuhlman*, 261 F.3d 303, 306 (2d Cir.2001) (noting that, under New York law, first-degree manslaughter is a lesser-included offense of second-degree murder). On June 20, 1984, Vargas was sentenced to an indeterminate term of 7½ to 22 ½ years in prison.

In appealing his conviction, Vargas argued, *inter alia*, that the trial judge erred in failing to charge the lesser-included offenses of second-degree manslaughter, *see* N.Y. Penal Law § 125.15(1), and criminally negligent homicide, *id.* § 125.10, crimes that require proof, respectively, of a reckless or negligent mental state, in contrast to first-degree manslaughter, which under § 125.20(1) and (2) requires proof of a specific intent to cause, respectively, serious physical injury or death. The Appellate Division, Second Department, rejected these arguments and affirmed Vargas's conviction, ruling that "no reasonable view of the evidence would support a finding that the defendant acted recklessly or negligently." *People v. Vargas*, 125 A.D.2d 512, 512, 509 N.Y.S.2d 591, 591 (2d Dep't 1986). The court observed that the record showed that Vargas had approached Ms. Molina "with an open knife in his hand, and stabbed her four times, once in the back." *Id.; see also People v. Suarez*, 6 N.Y.3d 202, 211–12, 811 N.Y.S.2d 267, 844 N.E.2d 721 (2005) (observing that "a one-on-one shooting or knifing (or similar killing) can almost never qualify as depraved indifference murder" under N.Y. Penal Law § 125.25(2) because the defendant in such killings almost always acts intentionally (quoting *People v. Payne*, 3 N.Y.3d 266, 272, 786 N.Y.S.2d 116, 119, 819 N.E.2d 634 (2004))).

Vargas remained incarcerated by New York State until August 1995, when he was released on parole.

### B. *The Removal Proceedings*

In November 1997, the Immigration and Naturalization Service ("INS")[1] instituted

---

1. The Homeland Security Act of 2002 dissolved the INS and transferred its functions to newly-created subdivisions in the Department of Homeland Security, effective March 1, 2003. *See* Pub.L. No. 107–296, 451, 471; 116 Stat. 2135, 2196, 2205 (codified as amended in scattered sections of the U.S.Code). The INS functions relevant to this case now reside in the Bureau of Citizenship and Immigration Services. *See* 6 U.S.C. § 271.

removal proceedings against Vargas on the ground that his New York State conviction for first-degree manslaughter rendered him an aggravated felon. Appearing before an IJ on February 4, 1998, Vargas, who was represented by counsel, admitted his manslaughter conviction but challenged removability, arguing, *inter alia*, that manslaughter in the first degree does not constitute a crime of violence within the statutory definition of aggravated felony, *see* 8 U.S.C. § 1101(a)(43)(F), and that, in any event, the "aggravated felony" ground for removal should not apply retroactively to his 1984 conviction.[2] In May 1998, the IJ rejected these challenges as without merit and ordered Vargas removed to Peru.[3]

Vargas appealed to the BIA, which, on April 4, 2002, summarily affirmed the IJ's removal order. In May 2002, Vargas timely petitioned this court for review. While that petition was pending, this court ruled in *Jobson v. Ashcroft*, 326 F.3d 367 (2d Cir.2003), that second-degree manslaughter in violation of N.Y. Penal Law § 125.15(1), was not a "crime of violence" under 18 U.S.C. § 16(b) and, thus, not an "aggravated felony" for purposes of removal. Pursuant to a stipulation by the parties, filed July 18, 2003, this court vacated the BIA's challenged April 2002 order and remanded the case to the agency for reconsideration in light of *Jobson.*

On January 2, 2004, the BIA issued an unpublished decision explaining why, despite *Jobson*, it upheld the order of removal in Vargas's case. On February 5, 2004, the BIA published its decision with "edito-

**2.** Title 8 U.S.C. § 1227(a)(2)(A)(iii), which provides for the removal of aliens convicted of aggravated felonies, was enacted in 1988, four years after Vargas's conviction, as part of the Anti–Drug Abuse Act of 1988. *See* Pub.L. No. 100–690, § 7343, 102 Stat. 4181, 4470 (1988). It initially applied only to aliens convicted of murder, certain drug crimes, or certain firearms offenses. *See id.* § 7432. In 1990, Congress enacted the Immigration Act of 1990, which expanded the definition of "aggravated felony" to include "any crime of violence" for which the imposed prison sentence was five years or longer. *See* Pub.L. No. 101–649, § 501, 104 Stat. 4978, 5048 (1990). On September 30 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRI-RA"), further expanding the definition of "aggravated felony" to encompass "any crime of violence" resulting in a prison sentence of one year or more. *See* Pub.L. No. 104–208, § 321, 110 Stat. 3009–546, 3009–628 (1996). IIRIRA also clarified the temporal scope of its definition amendment, providing: "Notwithstanding any other provision of law (including any effective date), [the amended definition of aggravated felony] applies regardless of whether the conviction was entered before, on, or after the date of enactment of this paragraph." *Id.* § 321(b), 110 Stat. at 3009–628 (codified as amended at 8 U.S.C. § 1101(a)(43)). The effective date provision

for the expanded definition of "aggravated felony" similarly provides: "The amendments made by this section shall apply to actions taken on or after the date of the enactment of this Act, regardless of when the conviction occurred." *Id.* § 321(c), 110 Stat. at 3009–628 (codified as amended at 8 U.S.C. § 1101 note).

Construing these statutes, this court has concluded that IIRIRA's expanded definition of "aggravated felony" applies retroactively to convictions pre-dating 1996. *See, e.g., Gelman v. Ashcroft*, 372 F.3d 495, 499 (2d Cir. 2004); *Kuhali v. Reno*, 266 F.3d 93, 110–11 (2d Cir.2001) (construing the 1996 IIRIRA amendments to the Immigration and Nationality Act's ("INA") definition of "aggravated felony" to apply retroactively to petitioner's 1980 conviction). Vargas does not argue otherwise on this appeal.

**3.** The IJ also rejected Vargas's arguments that (1) his removal proceeding was barred by *res judicata*, based on a pre–1996 INS decision not to pursue his deportation; (2) he was entitled to a waiver of inadmissibility under INA § 212(h), *see* 8 U.S.C. § 1182(h), on equal protection grounds; and (3) the removal proceeding should be terminated because he was pursuing naturalization. Vargas does not pursue these issues in his petition to this court.

rial changes consistent with our designation of the case as precedent." *In re Vargas–Sarmiento,* 23 I. & N. Dec. 651, n. 1, 2004 WL 233460 (BIA 2004). It is to this published decision that we cite in this opinion. The BIA observed that, because the first and second subsections of New York's first-degree manslaughter statute "require proof of intent to cause either serious physical injury or death," Vargas's crime of conviction "differs significantly" from the second-degree manslaughter charge in *Jobson,* which requires proof only of "reckless conduct." *Id.* at 653. The BIA noted that reckless conduct necessarily " 'encompasse[s] many situations' involving omissions or passive conduct that 'do no[t] involve any risk that the defendant will apply force to the victim.' " *Id.* (quoting *Jobson v. Ashcroft,* 326 F.3d at 373). By contrast, "where the defendant has purposefully sought to kill or seriously injure another person and has succeeded in causing a death," there is a high likelihood of affirmative conduct. *Id.* at 654. More to the point, "the inherent nature" of a crime that intends to cause death or serious physical injury necessarily contemplates "a *substantial risk* that the defendant may intentionally use force in committing the crime." *Id.* (emphasis added). Accordingly, the BIA ruled that "the offenses prohibited by subsections 1 and 2 [of § 125.20] are crimes of violence within the meaning of 18 U.S.C. § 16(b)," making Vargas removable as an alien convicted of an aggravated felony. *Id.*

On January 20, 2004, Vargas petitioned this court for review of this BIA decision.

## II. Discussion

### A. *Jurisdiction*

■ As a rule, federal courts lack jurisdiction to review final agency orders of removal based on an alien's conviction for certain crimes, including aggravated felonies. *See* 8 U.S.C. § 1252(a)(2)(C). The REAL ID Act of 2005 recently clarified that courts, nevertheless, retain jurisdiction to review "constitutional claims or questions of law raised upon a petition for review." Pub.L. No. 109–13, § 106(a)(1)(A)(iii), 119 Stat. 231, 310 (2005), (codified at 8 U.S.C. § 1252(a)(2)(D)); *see Joaquin–Porras v. Gonzales,* 435 F.3d 172, 177–78 (2d Cir.2006). This includes questions of law raised in petitions for review of removal orders based on aggravated felony convictions. *See, e.g., Aguiar v. Gonzales,* 438 F.3d 86, 87–88 (1st Cir.2006) (holding that REAL ID Act extends court's jurisdiction to questions of law raised upon petitions for review, including petitions for review of removal orders based on aggravated felony convictions); *Hernandez–Alvarez v. Gonzales,* 432 F.3d 763, 765–66 (7th Cir.2005) (same); *Tran v. Gonzales,* 414 F.3d 464, 467 (3d Cir.2005) (same). No different conclusion is warranted by the fact that Vargas raises a legal challenge to a removal order that became final before the May 11, 2005 enactment of the REAL ID Act. because Congress expressly gave that law retroactive effect. *See* REAL ID Act § 106(b) (providing that Act applies to cases "in which the final administrative order of removal, deportation, or exclusion was issued before, on, or after, the date of [ ] enactment"); *see also Gittens v. Menifee,* 428 F.3d 382, 384–85 (2d Cir.2005) (*per curiam* ) (noting that REAL ID Act, by its terms, is retroactive). Thus, this court has jurisdiction to review Vargas's legal claim that his first-degree manslaughter conviction does not constitute an aggravated felony under the relevant law.[4]

---

4. Even before enactment of the REAL ID Act, this court had ruled that we necessarily re-

tained jurisdiction to determine whether a jurisdictional bar applied. *See, e.g., Dickson*

## B. *Standard of Review*

When the BIA construes the Immigration and Nationality Act ("INA"), codified at 8 U.S.C. §§ 1101 *et seq.*, a statute that it is charged with administering, federal courts "must give 'substantial deference'" to the agency interpretation, *Abimbola v. Ashcroft*, 378 F.3d 173, 175 (2d Cir.2004) (quoting *Evangelista v. Ashcroft*, 359 F.3d 145, 150 (2d Cir.2004)), unless it is "arbitrary, capricious, or manifestly contrary to the statute," *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see Dickson v. Ashcroft*, 346 F.3d 44, 48 (2d Cir.2003). By contrast, we "'owe no deference to [the BIA's] interpretations of state or federal criminal laws, because the agency is not charged with the administration of such laws.'" *Sutherland v. Reno*, 228 F.3d 171, 174 (2d Cir.2000) (quoting *Michel v. INS*, 206 F.3d 253, 262 (2d Cir.2000) (opinion of Sotomayor, J.)). We review the BIA's interpretation of state or federal criminal laws *de novo*. *See id.; Jobson v. Ashcroft*, 326 F.3d at 371.

Because the issue before us—whether manslaughter in the first degree under New York law is a crime of violence— ultimately depends on the interpretation of federal and state criminal statutes, specifically, 18 U.S.C. § 16 and N.Y. Penal Law § 125.20, our review of this petition is *de novo*. *See Dickson v. Ashcroft*, 346 F.3d at 48; *Jobson v. Ashcroft*, 326 F.3d at 371.

## C. *Relevant Federal and State Statutes*

A brief review of the statutes relevant to this appeal is useful to our discussion of the merits of Vargas's legal challenge.

*v. Ashcroft*, 346 F.3d 44, 47–48 (2d Cir.2003) (noting that court has jurisdiction to determine whether jurisdictional bar applies); *Dal-*

## 1. *Aggravated Felony*

INA § 237(a)(2)(A)(iii) states that "[a]ny alien who is convicted of an aggravated felony at any time after admission is deportable." 8 U.S.C. § 1227(a)(2)(A)(iii). INA § 101(a)(43) includes a variety of crimes within its statutory definition of "aggravated felony," including, but by no means limited to, murder, rape, drug trafficking, firearms trafficking, and money laundering. *See* 8 U.S.C. § 1101(a)(43). Also included within the definition of "aggravated felony" is any "crime of violence (as defined in section 16 of Title 18, but not including a purely political offense) for which the term of imprisonment [is] at least one year." *Id.* § 1101(a)(43)(F).

## 2. *Crime of Violence*

Section 16 of Title 18 offers two definitions of "crime of violence":

(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16. Because the BIA ruled that Vargas's first-degree manslaughter conviction qualified as a crime of violence under § 16(b), we focus on that subsection in this opinion.

## 3. *First–Degree Manslaughter*

New York Penal Law § 125.20 identifies four distinct circumstances in which a person commits manslaughter in the first degree: when

*ion v. Ashcroft*, 257 F.3d 200, 203 (2d Cir. 2001); *Bell v. Reno*, 218 F.3d 86, 89 (2d Cir.2000).

1. With intent to cause serious physical injury to another person, he causes the death of such person or of a third person; or

2. With intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance, as defined in paragraph (a) of subdivision one of section 125.25. The fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree and need not be proved in any prosecution initiated under this subdivision; or

3. He commits upon a female pregnant for more than twenty-four weeks an abortional act which causes her death, unless such abortional act is justifiable pursuant to subdivision three of section 125.05; or

4. Being eighteen years old or more and with intent to cause physical injury to a person less than eleven years old, the defendant recklessly engages in conduct which creates a grave risk of serious physical injury to such person and thereby causes the death of such person.

N.Y. Penal Law § 125.20.

"Serious physical injury," as referenced in subsection (1) of § 125.20, is defined by New York law as "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y. Penal Law § 10.00(10).

■ "Extreme emotional disturbance," as referenced in subsection (2) of § 125.20, is a partial affirmative defense to second-degree murder that is available where "[t]he defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse." *Id.* § 125.25(1)(a); *see People v. White,* 79 N.Y.2d 900, 903, 581 N.Y.S.2d 651, 652–53, 590 N.E.2d 236 (1992) (describing components of extreme emotional disturbance defense as (1) objective element requiring proof that there was reasonable explanation or excuse; and (2) subjective element requiring proof that conduct was influenced by extreme emotional disturbance at time crime was committed). If a defendant charged with second-degree murder proves extreme emotional disturbance by a preponderance of the evidence, he is not acquitted; rather, the charge of conviction is reduced from murder to manslaughter in the first degree. *See DeLuca v. Lord,* 77 F.3d 578, 585 (2d Cir.1996) (citing *People v. Casassa,* 49 N.Y.2d 668, 675, 427 N.Y.S.2d 769, 772–73, 404 N.E.2d 1310 (1980)).

D. *The Categorical Approach to Identifying Crimes of Violence under 18 U.S.C. § 16*

1. *Categorical Analysis*

■ In the context of removal proceedings, this court has ruled that a "categorical approach" must be used to determine whether an offense is a "crime of violence" within the meaning of 18 U.S.C. § 16(b). *Dalton v. Ashcroft,* 257 F.3d 200, 204 (2d Cir.2001). Under this categorical approach, a reviewing court must focus on "the intrinsic nature of the offense," rather than on " 'the singular circumstances of an individual petitioner's crimes[,] ... and only the minimum criminal conduct necessary to sustain a conviction under a given statute is relevant.' " *Id.* (quoting *Michel v. INS,* 206 F.3d at 270 (Calabresi, J.,

dissenting)); *see also Ming Lam Sui v. INS*, 250 F.3d 105, 117–18 (2d Cir.2001) (noting that reviewing court "cannot go behind the offense as it was charged to reach [its] own determination as to whether the underlying facts amount to one of the enumerated crimes"). We have described the categorical approach as "not only consistent with both precedent and sound policy" but, also, as "necessary in view of the language of the applicable statutes." *Jobson v. Ashcroft*, 326 F.3d at 372 (internal quotation marks omitted). Thus, it is the language of 18 U.S.C. § 16(b), which defines a crime of violence "by its nature," that " 'compels' a reviewing court to focus 'on the intrinsic nature of the offense rather than on the factual circumstances surrounding any particular violation.' " *Id.* (quoting *Dalton v. Ashcroft*, 257 F.3d at 204).

### 2. *Divisible Penal Statutes*

a. *Identifying Divisible Penal Statutes*

■ Despite this general prohibition against inquiry into the factual circumstances of the crime underlying a removal order, a limited review of the record may be warranted where the statute of conviction is divisible. A criminal statute is "divisible" if it encompasses multiple categories of offense conduct, some, but not all, of which would categorically constitute aggravated felonies under the INA. *See Abimbola v. Ashcroft*, 378 F.3d at 177; *Dickson v. Ashcroft*, 346 F.3d at 48; *Kuhali v. Reno*, 266 F.3d 93, 106 (2d Cir. 2001). In reviewing a removal petition based on a conviction under a divisible statute, a court applying the categorical approach may look beyond the language of the statute "to the record of conviction for the limited purpose of determining whether the alien's conviction was under the branch of the statute that permits removal." *Dickson v. Ashcroft*, 346 F.3d at 48–

49. The "record of conviction" includes the "charging document, plea agreement, a verdict or judgment of conviction, and a record of the sentence or plea transcript." *Abimbola v. Ashcroft*, 378 F.3d at 177 (citing 8 U.S.C. § 1229a(c)(3)(B)).

b. *New York Penal Law § 125.20 Is a Divisible Statute*

■ Applying these principles to this case, we conclude that New York's first-degree manslaughter statute, N.Y. Penal Law § 125.20, is divisible. The first two subsections of that statute require the defendant's conduct to have been committed with the specific intent to cause serious physical injury or death to some person. *See* N.Y. Penal Law § 125.20(1) and (2). Two other subsections identify first-degree manslaughter in circumstances causing death without regard to any specific intent to kill or cause serious physical injury: when certain abortional acts cause, however unintentionally, the death of the mother, *see id.* § 125.20(3); or when a person over the age of eighteen intent on causing some physical injury to a child under the age of eleven engages in reckless conduct resulting in the child's death, *see id.* § 125.20(4).

Vargas's judgment of conviction does not specify the subsection of § 125.20 under which he was convicted. In light of the very different conduct and intent specified in the statutory subsections, however, it is certainly "conceivable" that a categorical determination whether Vargas committed an aggravated felony could vary depending upon the subsection of conviction. *See Ming Lam Sui v. INS*, 250 F.3d at 118 (concluding that "[b]ecause it [was] conceivable" that determination of whether petitioner committed aggravated felony under INA "would vary depending on whether he or she had been convicted alternatively of making, possessing, or uttering, counterfeit securities," court could

look to charging documents to determine proscribed activity at issue); *see generally In re Vargas–Sarmiento*, 23 I. & N. Dec. at 654 (observing that first-degree manslaughter as defined in subsection (3) of N.Y. Penal Law § 125.20 does not involve inherent substantial risk of force and, therefore, may not be a "crime of violence").[5] In these circumstances, we treat N.Y. Penal Law § 125.20 as a divisible statute for purposes of § 16(b) analysis.

### c. *Vargas's First–Degree Manslaughter Conviction Was Pursuant to N.Y. Penal Law § 125.20(1) or (2)*

The parties do not dispute the divisibility of § 125.20. Indeed, they appear to concur that Vargas's first-degree manslaughter conviction is pursuant to either subsection (1) or (2) of § 125.20 and that those sections should be the focus of our § 16(b) analysis. We agree.

The second-degree murder indictment against Vargas charged that "on or about October 9, 1982, in the county of Kings, with intent to cause the death of Miriam M. Molina, [Vargas] caused the death of Miriam M. Molina by stabbing her with a sharp instrument and thing, thereby inflicting divers wounds and injuries" from which she died. Indictment No. 5626/1982. This pleading makes plain that Vargas's conviction for the lesser-included crime of first-degree manslaughter was necessarily pursuant to either (a) subsection (1) of § 125.20 because, although Vargas caused Ms. Molina's death, his specific intent was only to cause her serious physical injury; or (b) subsection (2) because, although

Vargas caused Ms. Molina's death with the specific intent to do so, he satisfactorily demonstrated that he acted under an extreme emotional disturbance. Nothing in the record would support a conclusion that Vargas's first-degree manslaughter conviction involved the abortional acts specified in subsection (3) or a child victim as specified in subsection (4). Indeed, subsection (4) was not even added to § 125.20 until 1990, almost six years after the jury returned its verdict against Vargas. *See* N.Y. Laws 1990 ch. 477, § 3 (creating N.Y. Penal Law § 125.20(4)).

Having thus identified the relevant statutory sections of conviction, we turn to the critical issue raised by Vargas's petition: whether first-degree manslaughter as defined in N.Y. Penal Law § 125.20(1) or (2) categorically qualifies as a crime of violence within the meaning of 18 U.S.C. § 16(b).

### E. *First–Degree Manslaughter in Violation of N.Y. Penal Law § 125.20(1) or (2) Is, By Its Nature, a Crime of Violence Under 18 U.S.C. § 16(b)*

1. *The Plain Language of § 16(b) Requires that a Felony Offense Present a "Substantial Risk" of the Intentional Use of Physical Force, not the Invariable Use of Such Force, to Constitute a Crime of Violence under § 16(b)*

In determining whether a felony offense constitutes a crime of violence within the meaning of 18 U.S.C. § 16(b),

---

**5.** In its initial unpublished ruling, the BIA similarly ruled that convictions pursuant to § 125.20(4) may not be crimes of violence. The conclusion was deleted from the final published decision. Because we conclude, for reasons discussed in the next subsection of this opinion, that Vargas was convicted of first-degree manslaughter pursuant to either subsection (1) or (2) of N.Y. Penal Law § 125.20, on this petition, we decide only whether a conviction under either of these two statutory subsections categorically qualifies as a crime of violence. We do not address that question as it pertains to subsections (3) or (4) of § 125.20.

we necessarily begin with the plain language of that statute. *See Leocal v. Ashcroft,* 543 U.S. 1, 8, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004) (citing *Bailey v. United States,* 516 U.S. 137, 144, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995)). As we previously observed, § 16(b) defines "crime of violence" as any "felony ... that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 16(b). Preliminarily, we note that this provision "sweeps more broadly'" than § 16(a), *Leocal v. Ashcroft,* 543 U.S. at 10, 125 S.Ct. 377, which defines non-felony (as well as felony) offenses as crimes of violence only if they have "as an *element* the use, attempted use, or threatened use of physical force against the person or property of another," 18 U.S.C. § 16(a) (emphasis added); *see Chrzanoski v. Ashcroft,* 327 F.3d 188, 196 (2d Cir.2003) (holding that misdemeanor crimes cannot be violent felonies under § 16 unless they "have as an element the use of force"). No such element requirement is specified in § 16(b). *See Chrzanoski v. Ashcroft,* 327 F.3d at 196 (noting this distinction between § 16(a) and § 16(b)). Rather, the plain language of § 16(b) instructs courts to focus on the nature of the felony at issue to determine if it inherently presents "a substantial risk" that the perpetrator "may" use physical force in the commission of the crime. *See Dickson v. Ashcroft,* 346 F.3d at 51 (holding that, even if none of the elements of unlawful imprisonment under N.Y. Penal Law § 135.10 expressly require the use of physical force, the offense still satisfies 18 U.S.C. § 16(b) because, "by its nature," the felony "involves a *substantial risk that force may be used*" (emphasis in original)).

 We have broadly defined "physical force" for purposes of § 16 as "'power, violence, or pressure directed against a person or thing.'" *Dickson v. Ashcroft,* 346 F.3d at 50 (quoting *Chrzanoski v. Ashcroft,* 327 F.3d at 192, and rejecting argument that force referenced in § 16(b) must be "*violent* force applied directly to the person of the victim*" (emphasis in original)). For a particular felony, by its nature, to present a "substantial risk" of the use of such physical force, a court need not conclude that commission of the crime requires the invariable application of such force. As the Supreme Court stated in *Leocal v. Ashcroft,* the language of § 16(b) defines as a crime of violence those felony offenses "that naturally involve a person acting in disregard of the risk that physical force *might* be used against another in committing an offense." 543 U.S. at 10, 125 S.Ct. 377 (emphasis added). Thus, the Court observed that "physical force need not actually be applied" in the commission of the charged felony for it to qualify as a crime of violence under § 16(b). *Id.* at 11, 125 S.Ct. 377; *Jobson v. Ashcroft,* 326 F.3d at 374 (noting that "an offense need not require an actual use of force to come within section 16(b)'s reach"). The critical categorical inquiry is whether, inherent in any commission of the felony is "a substantial risk" that the perpetrator "may" use such force. *Leocal v. Ashcroft,* 543 U.S. at 10, 125 S.Ct. 377; *accord Dickson v. Ashcroft,* 346 F.3d at 51 (noting that § 16(b) inquiry is necessarily broad and flexible, asking not whether it is conceivable that the felony could be committed without the use of force but whether "the crime is one that *by its nature* involves a substantial *risk* that force *may* be used" (emphasis in original)).

### 2. *Section 16(b) References a Substantial Risk of the "Intentional" Use of Force*

In construing § 16(b) to require a "substantial risk" of the use of physical force, rather than the invariable application of such force, this court has ruled that the

contemplated risk refers to intentional, rather than merely negligent or accidental, use of force. As explained in *Dalton v. Ashcroft,* this is because " § 16(b) contemplates only *intentional* conduct and refers only to those offenses in which there is a substantial likelihood that the perpetrator will *intentionally* employ physical force, ... not [to] an accidental, unintended event." 257 F.3d at 208 (emphasis added) (internal quotation marks omitted); *accord Jobson v. Ashcroft,* 326 F.3d at 374; *see also Bazan–Reyes v. INS,* 256 F.3d 600, 611 (7th Cir.2001) (holding that physical force that may be used pursuant to § 16(b) "must be accompanied by intent to use that force"); *United States v. Chapa–Garza,* 243 F.3d 921, 926 (5th Cir.2001) (noting that language of § 16(b) "suggests a willingness to risk having to commit a crime of specific intent" (internal quotation marks omitted)). This construction finds some support in *Leocal v. Ashcroft,* wherein the Supreme Court observed that, because the ordinary meaning of the word " 'use' requires active employment," § 16(b)'s reference to a risk of the use of physical force in the commission of the charged felony "most naturally suggests a higher degree of intent than negligent or merely accidental conduct." 543 U.S. at 9–11, 125 S.Ct. 377.[6]

3. *Identifying Crimes that Categorically Present a Significant Risk of the Intentional Use of Physical Force*

Applying these principles to various felony offenses, courts have concluded that, among the crimes categorically presenting a serious risk of the intentional use of physical force are burglary, *see id.* at 10, 125 S.Ct. 377 (observing that burglary is a "classic" crime of violence "*not* because the offense can be committed in a generally reckless way or because someone may be injured, but because burglary, by its nature, involves a substantial risk that the burglar will use force against a victim in completing the crime" (emphasis in original)); the solicitation of murder for hire, *Ng v. Attorney General,* 436 F.3d 392, 396 (3d Cir.2006) (holding that "solicitation of a murder naturally presents a substantial risk that physical force will be used against another, regardless of whether the risk develops or harm actually occurs"); unlawful imprisonment of a competent adult, *see Dickson v. Ashcroft,* 346 F.3d at 51 (observing that, even where competent adult is restrained "by deception, ... the offense will either involve the use of force to effectuate the restraint, or by its nature involve a substantial risk that force may be used"); and statutory rape, *see Chery v. Ashcroft,* 347 F.3d 404, 408 (2d Cir.2003) (observing that statutory rape "cases can be imagined where a defendant's conduct does not create a genuine probability that force will be used, but the *risk* of force remains inherent" in an offense to which the victim cannot consent (emphasis in original)). *See also United States v. Jackson,* 301 F.3d 59, 63 (2d Cir.2002) (holding that escape qualifies as a "violent felony"

**6.** In *Leocal,* the Supreme Court expressly did not rule as to whether a felony involving "the *reckless* use of force against a person or property of another qualifies as a crime of violence" under § 16. 543 U.S. at 13, 125 S.Ct. 377 (emphasis in original). The Court did, however, note that a measure of recklessness was implicit in § 16(b) to the extent the statute covered "offenses that naturally involve a person acting in disregard of the risk that physical force might be used against another in committing an offense." *Id.* at 10, 125 S.Ct. 377. The Court explained that this "reckless disregard ... relates *not* to the general conduct" proscribed by the statute at issue "or to the possibility that harm will result from a person's conduct." *Id.* (emphasis in original). Rather, it alludes to a "reckless disregard" for "the risk that the use of physical force against another might be required in committing a crime." *Id.*

under 18 U.S.C. § 924(c) because "escape invites pursuit; and the pursuit, confrontation, and recapture of the escapee entail serious risks of physical injury to law enforcement officers and the public"[7]; *United States v. Gay,* 251 F.3d 950, 953–55 (11th Cir.2001) (collecting cases concluding that even a non-violent, walk-away escape constitutes a crime of violence under U.S.S.G. § 4B1.2 because of risk inherent in nature of escape that the escapee, intent on securing freedom, may use force to avoid recapture); *United States v. Danielson,* 199 F.3d 666, 671–72 (2d Cir.1999) (*per curiam*) (holding that weapons possession in violation of N.Y. Penal Law § 265.03 is "violent felony" within the meaning of 18 U.S.C. § 924(e)(2)(B) where jury was required to find that defendant's "conscious aim or objective [was] to use a loaded firearm against another"); *United States v. Kaplansky,* 42 F.3d 320, 324 (6th Cir.1994) (holding that attempted kidnapping is violent felony for purposes of enhanced sentence under 18 U.S.C. § 924(e)(2)(B)(ii) because, even if deception is used to effect crime, that does not erase ever-present possibility that victim may discover plan and resist, requiring perpetrator to use force to achieve objective). Although it is possible to hypothesize circumstances under which each of these crimes could be committed without the actual use of physical force, these courts have found that, under the relevant statutes, their inherent nature always

presents the requisite "substantial risk" of the intentional use of force.

By contrast, courts have declined to recognize as a crime of violence within the meaning of § 16(b) a felony offense for driving under the influence of alcohol. In so holding with respect to Florida's felony DWI statute, the Supreme Court explained that a person who unintentionally causes injury while driving under the influence of alcohol cannot reasonably be said to have " 'use[d] physical force against another.' " *Leocal v. Ashcroft,* 543 U.S. at 9–10, 125 S.Ct. 377. In earlier reaching the same conclusion with respect to a comparable New York statute, this court observed that a person may be convicted of driving while intoxicated in New York even when asleep at the wheel of a car that has never moved and whose engine is not running, in short, under circumstances presenting "no risk that force may be used." *Dalton v. Ashcroft,* 257 F.3d at 205.[8] Indeed, *Dalton* foreshadowed *Leocal* in concluding that, even when drunk driving involves the operation of a vehicle on the roadways resulting in injuries to persons, "one cannot [say that the driver intentionally] *use*[d] force in an accident." *Id.* at 206 (emphasis in original). This is because " 'use implies intentional availment,' " and " '[n]o availment of force in order to achieve an end is present in a drunk driving accident.' " *Id.* (quoting *United States v. Rutherford,* 54 F.3d 370, 372–73 (7th Cir.1995)).

---

7. Section 924(e)(2)(B) defines violent felony as a crime punishable by a term of imprisonment exceeding one year that:

 i. has as an element the use, attempted use, or threatened use of physical force against the person of another; or

 ii. is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B).

8. Although *Dalton* observed that the "risk of physical force is not a requisite *element* of the New York DWI offense," 257 F.3d at 205 (emphasis added), we do not understand this fact to have been determinative of the court's § 16(b) inquiry. If the *Dalton* majority had thus equated § 16(a) and § 16(b), there would have been no need for its detailed discussion of the meaning of "substantial risk" and "use of physical force," the critical language in § 16(b). *See id.* at 205–08.

In *Jobson v. Ashcroft*, this court concluded that these principles compelled a conclusion that "recklessly caus[ing] the death of another person," second-degree manslaughter under N.Y. Penal Law § 125.15(1), did not qualify as a crime of violence under § 16(b). 326 F.3d at 372. *Jobson* summarized the two essential requirements of § 16(b): (1) that the felony offense "inherently pose[ ] a substantial risk that a defendant will use physical force," and (2) that the risk contemplate "an *intentional* use of force." *Id.* at 374 (emphasis in original). *Jobson* concluded that second-degree manslaughter could not satisfy either of these requirements because, under New York law, the crime could be committed by "passive conduct or omissions." *Id.* at 373; *see, e.g., People v. Stubbs*, 122 A.D.2d 91, 504 N.Y.S.2d 235 (2d Dep't 1986) (holding that failure to feed child satisfied § 125.25(1)). *Jobson* explained that, as a consequence, second-degree manslaughter "encompasses many situations in which the defendant applies no physical force to the victim, and more importantly, situations that do not involve *any* risk that the defendant will apply force to the victim." *Jobson v. Ashcroft*, 326 F.3d at 373 (emphasis added). The court ruled that a felony could not be identified as "a crime of violence under section 16(b)" unless its commission invariably "present[s] a substantial risk of the intentional use of force." *Id.* at 374 (rejecting argument "that an offense satisfies section 16(b) as long as *many* (but not all) convictions involve a substantial risk of the use of force" (emphasis in original)); *see also Chery v. Ashcroft*, 347 F.3d at 408. To present such an invariable risk, *Jobson* concluded that the predicate offense itself had to involve intentional conduct. It explained that "[o]n this view, a defendant must, in pursuing his intended criminal activity, risk having to intentionally use force to commit the offense. By contrast,

a defendant who is convicted of second-degree manslaughter, like other offenses of *pure* recklessness, may lack any 'intent, desire or willingness to use force or cause harm at all.'" *Jobson v. Ashcroft*, 326 F.3d at 374 (emphasis in original) (quoting *United States v. Parson*, 955 F.2d 858, 866 (3d Cir.1992)).

4. *Inherent in the Specific Intent Requirements of N.Y. Penal Law § 125.20(1) or (2) Is a Substantial Risk that a Person Committing First–Degree Manslaughter May Intentionally Use Physical Force*

Applying *Jobson*'s reasoning, as well as the principles derived from *Leocal* and our other § 16(b) precedents to this case, we conclude that first-degree manslaughter in violation of N.Y. Penal Law § 125.20(1) or (2) is categorically a crime of violence because inherent in the nature of that offense is a substantial risk that the perpetrator may intentionally use physical force in committing the crime. First-degree manslaughter, as defined in § 125.20(1) and (2), is readily distinguishable from second-degree manslaughter in that the former is a specific intent crime. To be found guilty under § 125.20(1) or (2), the accused must cause a human death while acting with the specific intent to do so or, at least, with the specific intent to cause serious physical injury. In short, first-degree manslaughter cannot be committed through mere reckless passivity or omission, circumstances identified in *Jobson* as presenting no risk of the intentional use of force. *See Jobson v. Ashcroft*, 326 F.3d at 373–74. Rather, as the government correctly observes, to carry out the specific intent detailed in § 125.20(1) or (2), an accused will generally intentionally use the most egregious forms of physical force: shooting, *see, e.g., People v. Paredes*, 251 A.D.2d 14, 673 N.Y.S.2d 144 (1st Dep't

1998); *People v. Valverde,* 205 A.D.2d 444, 614 N.Y.S.2d 402 (1st Dep't 1994); stabbing, *see, e.g., People v. Gill,* 20 A.D.3d 434, 798 N.Y.S.2d 507 (2d Dep't 2005); *People v. Cobbs,* 174 A.D.2d 751, 571 N.Y.S.2d 576 (2d Dep't 1991); beating, *see, e.g., People v. Peralta,* 1 A.D.3d 115, 767 N.Y.S.2d 70 (1st Dep't 2003); or some combination of the above, *see, e.g., People v. Bell,* 111 A.D.2d 926, 490 N.Y.S.2d 820 (2d Dep't 1985). Whatever other means a person might conceive to commit first-degree manslaughter, when his intent is to take a life, or at least to inflict serious physical injury—action likely to meet vigorous resistance from a victim—we can confidently conclude that inherent in the nature of the crime is a substantial *risk* that the perpetrator *may* intentionally use physical force to achieve his criminal objective. The fact that a perpetrator might accomplish his homicidal or seriously injurious objective before a victim could mount any resistance warrants no different conclusion. The nature of the objective and the possibility of discovery and resistance are enough to establish the requisite inherent risk that the perpetrator might intentionally use physical force. *Cf. Chery v. Ashcroft,* 347 F.3d at 408 (recognizing that

where consent is not—or cannot be—given to rape, the crime *"inherently* involves a substantial risk that physical force may be used" in its commission (emphasis in original)); *Jobson v. Ashcroft,* 326 F.3d at 373 (observing that "burglary is a crime of violence even though no force is used in a particular instance, because a burglar of a dwelling risks having to use force if the occupants are home and hear the burglar" (internal quotation marks and emphasis omitted)); *United States v. Kaplansky,* 42 F.3d at 324 (observing that possibility that unwitting kidnapping victim will discover plot and resist makes perpetrator's use of force an ever-present risk in the commission of the crime); *United States v. Gosling,* 39 F.3d 1140, 1142 (10th Cir.1994) (concluding that escape is properly deemed a violent crime because it can be analogized to "a powder keg, which may or may not explode into violence ..., but which always has the serious *potential* to do so" (emphasis in original)).

Accordingly, we conclude that first-degree manslaughter in violation of N.Y. Penal Law § 125.20(1) or (2) qualifies as a "crime of violence" within the plain language of 18 U.S.C. § 16(b).[9]

---

**9.** This conclusion is reinforced by the legislative history of the federal statute. *Cf. Northbrook Nat'l Ins. Co. v. Brewer,* 493 U.S. 6, 9, 110 S.Ct. 297, 107 L.Ed.2d 223 (1989) (observing that "legislative history reinforce[d] ... Congress's pellucid language"); *The Brook, Inc. v. Comm'r,* 799 F.2d 833, 837 (2d Cir.1986) (noting that "meaning of the statute's plain language is reinforced by its legislative history"). As the Tenth Circuit has explained, § 16(b) was enacted as part of the Comprehensive Crime Control Act of 1984. *See United States v. Lucio–Lucio,* 347 F.3d 1202, 1205 (10th Cir.2003). That Act included a chapter on bail reform, which, *inter alia,* provided for a hearing before someone charged with certain crimes, including a "crime of violence," could be released on bail. *See id.* (citing Pub.L. No. 98–473, sec. 203(a), § 3142(f), 98 Stat.1976, 1979–80

(1984)) (codified as amended at 18 U.S.C. § 3142(f)). Although "crime of violence" is not defined in the bail reform legislation, there is no reason to think its meaning differs from that specified in § 16(b). *See Leocal v. Ashcroft,* 543 U.S. at 11, 125 S.Ct. 377 (observing that 16(b) defines "crime of violence" according to "ordinary meaning"). According to the Senate Report's discussion of the bail reform provision, the crimes of violence intended to trigger the required hearing include " 'essentially the same categories of offenses described in the District of Columbia Code by the terms 'dangerous crime' and 'crime of violence ....' " *United States v. Lucio–Lucio,* 347 F.3d at 1205 (quoting S.Rep. No. 98–225, at 20–21 & n. 60, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3203–04). These include *inter alia,* "murder, forcible rape, ... kidnapping, robbery, burglary, *voluntary*

### 5. *Vargas's Hypotheticals Warrant No Different Conclusion*

Vargas nevertheless insists that first-degree manslaughter should not be deemed a crime of violence under § 16(b) because he can hypothesize two circumstances in which the crime could be committed without any risk of the intentional use of physical force. First, he posits that a woman might intentionally kill her husband by poisoning food that she expects him to eat in her absence. Second, Vargas suggests that a wife, intent on causing her husband serious physical injury, might wear down the brake pads on a car to be driven by her spouse, resulting in his death in an automobile accident. Vargas submits that, in both these circumstances, the perpetrator uses no physical force against the victim. Further, he insists that in neither circumstance is there any risk that the perpetrator will use such force because she is not even on the scene at the time of death. Vargas's argument is flawed in at least two respects.

■ First, Vargas appears to misapprehend the essence of the categorical inquiry under § 16(b). Whether a crime, by its nature, presents a "substantial risk" that the perpetrator "may" intentionally use physical force is not answered in the negative simply because "cases can be imagined where a defendant's conduct does not create a genuine probability that force will be used." *Chery v. Ashcroft*, 347 F.3d at 408 (holding statutory rape a crime of violence even though defendant may be convicted where no actual force is used). Where a person's specific intent is to kill another human being or, at least, to cause him serious physical injury, there is necessarily a significant risk inherent in the nature of the crime that, if the perpetrator

cannot initially achieve his objective without physical force, he may ultimately resort to force to do so. *See Benjamin v. Bureau of Customs*, 383 F.Supp.2d 344, 346–47 (D.Conn.2005) (making same observation in holding that first-degree manslaughter under Connecticut law, Conn. Gen.Stat. § 53a–55(a)(1), is a crime of violence under § 16(b)).

■ Second, in Vargas's hypotheticals, the perpetrator does, in fact, intentionally use physical force in the commission of first-degree manslaughter. As we have previously observed, the physical force referenced in § 16(b) includes any "power, violence, or pressure directed against a person or thing." *Dickson v. Ashcroft*, 346 F.3d at 50. A perpetrator need not himself apply such force to a victim to make use of it; he need only " 'intentional[ly] avail[ ]' " himself of force in the commission of the crime. *Dalton v. Ashcroft*, 257 F.3d at 206 (quoting *United States v. Rutherford*, 54 F.3d at 372–73). Thus, in *Dickson*, we concluded that, when a perpetrator lures a person voluntarily to enter a room, only then to lock the door behind the person, the perpetrator has intentionally used physical force to commit the crime of imprisonment. This is because, "even though there has been no application of violent force [directly to the victim], the [perpetrator] has unquestionably, by locking the door, imposed physical barriers of forcible restraint." *Dickson v. Ashcroft*, 346 F.3d at 49.

So in Vargas's first hypothetical, when the perpetrator poisons food that she intends her spouse to eat, she engages in no mere passive act or reckless omission. Rather, she intentionally avails herself of the physical force exerted by poison on a

---

*manslaughter ....." Id.* (quoting D.C.Code § 23–1331(4) (1981)) (emphasis added); *see also* 18 U.S.C. § 3559(c)(2)(F) (specifying vol-

untary manslaughter as a "serious violent felony" for purposes of the federal "three strikes" law).

human body deliberately to kill her husband. First, she affirmatively exercises "power" over the contents of her husband's food to transform it into an agent of forcible destruction. Then she avails herself of that force to asphyxiate her husband (or otherwise destroy his vital bodily functions). That the wife may not herself administer the poison, that she may employ deceit to prompt her spouse's unwitting ingestion, and that she may not be present when the poison forcibly kills do not alter the § 16(b) conclusion. The fact remains that she deliberately set in motion a chain of events specifically intended to use the force of poison to kill her husband. *See id.* at 50 (holding that § 16(b) does not reference only force applied "directly to the person of the victim"). The risk of physical force referenced by § 16(b) can be the act of an agent (human or not) as long as there is, inherent in the crime, a substantial risk that the perpetrator may intentionally avail himself of that force. *See id.; see generally Ng v. Ashcroft*, 436 F.3d at 397 (holding that person who solicits another to perform murder himself commits crime of violence under § 16(b)). We would hardly conclude that a bomber does not intentionally use physical force when he deliberately kills scores of people simply because he rigs his deadly device to detonate only upon some act by one of his unsuspecting victims while the bomber himself is miles away. Thus, we are not persuaded by Vargas's argument that

first-degree manslaughter is not a crime of violence when it is committed by a person who intentionally poisons the food of an unwitting victim rather than by a person who directly injects the poison into his victim's arm. In either situation, the killer has intentionally availed himself of the forceful physical properties of poison to cause death. *See Dalton v. Ashcroft*, 257 F.3d at 206.[10]

Similarly, in Vargas's second hypothetical, the wife undoubtedly intends to avail herself of physical force to inflict serious physical injury on her husband. The agent of that force is her automobile. Toward that end, she intentionally exerts physical force on the vehicle to convert it from an ordinary means of transportation into what is, effectively, a weapon that will forcibly inflict intended serious injury on her husband without any need for the wife's presence or further action. *See Chrzanoski v. Ashcroft*, 327 F.3d at 194 (drawing distinction between "causation of an injury and an injury's causation by the 'use of physical force' ").

In sum, Vargas's hypotheticals fail to support his argument that first-degree manslaughter is not a crime of violence within the plain language of § 16(b).

### III. *Conclusion*

Because Vargas's first-degree manslaughter conviction was pursuant to N.Y.

---

10. Our observation in *Chrzanoski v. Ashcroft* that third-degree assault under Connecticut law, *see* Conn. Gen.Stat. § 53a–61, does not qualify as a crime of violence because it can be committed "not by physical force, but by guile, deception, or even deliberate omission," 327 F.3d at 195, must be read in context. Because § 53a–61 creates only a misdemeanor offense, our analysis was limited to § 16(a), which requires the offense to have "*as an element* the use, attempted use, or threatened use of physical force" to qualify as a crime of violence. 18 U.S.C. § 16(a) (em-

phasis added). Because the plain language of the Connecticut statute did not make use of force an explicit or implicit element, we ruled that misdemeanor third degree assault was not a crime of violence under § 16(a). *See Chrzanoski v. Ashcroft*, 327 F.3d at 196. *Chrzanoski* had no occasion to consider, much less rule on, the question whether a felony crime requiring proof of intent to kill or cause serious physical injury presents an inherent risk that the perpetrator may use physical force to achieve his objective.

Penal Law § 125.20(1) or (2), and because such first-degree manslaughter constitutes a crime of violence under 18 U.S.C. § 16(b), we conclude that the BIA correctly identified Vargas as an alien convicted of an aggravated felony subject to removal pursuant to 8 U.S.C. § 1227(a)(2)(A)(iii). Accordingly, because we lack jurisdiction further to review the order of removal in this case, Vargas's petition is hereby DISMISSED.

CALABRESI, J., concurring.

I join fully in Judge Raggi's opinion. I write separately to note that the cases in this area are somewhat difficult to reconcile with each other. That is, there are some cases in which we have held that a conviction involved a crime of violence, *see, e.g., Chery v. Ashcroft,* 347 F.3d 404 (2d Cir.2003) (statutory rape), that seemed to me to involve less risk of intentional use of physical force than other cases in which we have come out the other way, *see, e.g., Dalton v. Ashcroft,* 257 F.3d 200 (2d Cir.2001) (driving while intoxicated). It might be desirable if the Supreme Court or Congress were to give the circuits additional guidance in this area. That said, for all the reasons given in Judge Raggi's opinion, the particular crime of first-degree manslaughter as defined by New York, viewed categorically, fits very easily on the side of the spectrum of those we have held to be crimes of violence.