Adeodatus CANADA, Petitioner,

v.

Alberto R. GONZALES,* Attorney General of the United States, Michael Chertoff, Department of Homeland Security and Bureau of Immigration and Customs Enforcement, Respondents.

Docket No. 03–40051–AG.

United States Court of Appeals, Second Circuit.

Argued: Sept. 13, 2005.

Decided: May 18, 2006.

---

* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Alberto R. Gonzales, Attorney General of the United States, and Michael Chertoff, Secretary of the Department of Homeland Security, have been substituted for their predecessors, John Ashcroft and Tom Ridge, respectively.

Roberto Tschudin Lucheme, Glastonbury, Connecticut, for Petitioner.

Lara K. Eshkenazi, Assistant United States Attorney (Sara L. Shudofsky, Assistant United States Attorney, of counsel) for Michael J. Garcia, United States Attorney for the Southern District of New York, New York, New York, for Respondents.

·Before: MINER, RAGGI, Circuit · Judges, and KARAS, District Judge.**

KARAS, District Judge.

Petitioner Adeodatus Canada ("Petitioner") petitions for review of the May 29, 2003 decision of the Board of Immigration Appeals ("BIA") affirming the January 29, 2003 decision of Immigration Judge ("IJ") Michael W. Straus ordering Petitioner's removal from the United States. The IJ ordered Petitioner's removal because of his August 1, 2001 conviction for assault of a peace officer, in violation of Connecticut General Statutes ("CGS") § 53a–167c(a)(1), based on a plea of *nolo contendere*. The IJ viewed this conviction as involving a "crime of violence," thus making Petitioner eligible for removal as an aggravated felon. In affirming, the BIA concurred with the IJ's ruling. Because we agree that Petitioner's conviction involves a "crime of violence," we conclude that the BIA properly upheld Petitioner's removal as an aggravated felon, and we therefore dismiss the Petition.

** The Honorable Kenneth M. Karas of the United States District Court for the Southern District of New York, sitting by designation.

## BACKGROUND

Petitioner is a citizen of the Philippines and a lawful permanent resident of the United States who entered this country on January 21, 1990. On July 11, 2001, Petitioner entered a plea of *nolo contendere* to assault of a peace officer, in violation of CGS § 53a–167c(a)(1), and to illegal operation of a motor vehicle under the influence of alcohol, in violation of CGS § 14–227a. During the allocution, the prosecutor outlined the conduct that led to the charges against Petitioner. According to the prosecutor, a police officer pulled over Petitioner after observing him driving his car erratically. When the officer instructed Canada to place his hands where he could see them, Canada refused and instead "began piping in his opinions using ·various expletives." *Hearing Tr.*, July 11, 2001; at 5. Then,

> [t]he officer turned his flashlight—switched hands with his flashlight and began reaching over to the steering wheel of the vehicle to attempt to take the keys away from [Petitioner] to keep him from starting the vehicle. . . .

> As the officer reached over the steering wheel to grab the keys, [Petitioner] began struggling with the officer[ ] and succeeded in starting the vehicle, began revving the engine. He then quickly shifted the vehicle into reverse and proceeded to back up at a high rate of speed spinning his tires. The officer's left arm was now stuck between the steering wheel and the dashboard and the front door post, and the officer was now dragged alongside [Petitioner's] vehicle backwards.

*Id.* Eventually, after being dragged alongside Petitioner's car, the officer was able to get Petitioner to put the car into park and

prevent Petitioner from further driving the car. Back-up officers arrived only to face additional resistance from Petitioner.

After this allocution, and after Petitioner was advised of his trial rights, the court informed Petitioner that he would be facing a sentence of "6 years suspended after 2 years in jail" with "respect to the assault on a police officer charge." *Id.* at 12. Petitioner then entered his plea. Thereafter, on August 1, 2001, Petitioner was convicted and sentenced to a total of four years' imprisonment (suspended after eighteen months' imprisonment) and five years' probation.

On December 22, 2002, Petitioner was served with a Notice to Appear, alleging that he was removable under 8 U.S.C. § 1227(a)(2)(A)(iii) as an alien who had been convicted of an aggravated felony, to wit, a crime of violence for which the term of imprisonment was at least one year, pursuant to 8 U.S.C. § 1101(a)(43)(F). On January 3, 2003, Petitioner first appeared before an IJ, who adjourned the hearing to permit Petitioner to obtain counsel. The next hearing was held on January 15, 2003, during which an attorney appeared on behalf of Petitioner and during which Petitioner's conviction was made part of the record.

After receiving submissions from both sides, the IJ ruled that Petitioner's assault of a peace officer, in violation of CGS § 53a–167c(a)(1), "would clearly give rise to a substantial risk that the public safety officer would be subject to physical force" and that any such force would be intentional. *IJ Oral Decision,* Jan. 29, 2003, at 6. Consequently, the IJ found that Petitioner's offense of conviction was a "crime

of violence," thus making Petitioner an aggravated felon eligible for removal.

Petitioner appealed to the BIA. On May 29, 2003, the BIA dismissed the appeal and ordered his removal. Agreeing with the IJ, the BIA noted that "an individual who intentionally injures a peace officer acting in the line of duty necessarily runs the risk of having to intentionally employ physical force, either to injure the officer ... or to protect himself from harm." *BIA Decision,* May 29, 2003, at 4. One BIA member dissented, noting that he was "not persuaded that all possible convictions under section 53a–167c(a)(1)" involved substantial risk of the use of force. *Id.* at 5. This appeal followed.

## DISCUSSION

### A. Jurisdiction and Standard of Review

Under section 242(a)(2)(C) of the Immigration and Nationality Act of 1952 ("INA"), 8 U.S.C. § 1252(a)(2)(C), as amended by the Real ID Act of 2005, "no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense" covered by INA § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii).[1] However, the INA, as amended by the Real ID Act, permits us to review "questions of law raised upon a petition for review filed with an appropriate court of appeals." 8 U.S.C. § 1252(a)(2)(D). Because the question of whether Petitioner's offense is a "crime of violence" (and therefore constitutes an aggravated felony) is such a question of law, we have jurisdiction to review it. In answering this question, we review *de novo* the BIA's decision. *See Dos Santos v.*

---

1. The relevant section of the Real ID Act took effect immediately upon enactment of the Real ID Act on May 11, 2005, and applies to final orders of removal issued "before, on, or after the date of the enactment of this division." Real ID Act of 2005, Pub.L. No. 109–13, Div. B, tit. I, § 106(b), 119 Stat. 231, 311 (2005).

*Gonzales,* 440 F.3d 81, 83 (2d Cir.2006); *Jobson v. Ashcroft,* 326 F.3d 367, 371 (2d Cir.2003); *Mugalli v. Ashcroft,* 258 F.3d 52, 56 (2d Cir.2001). If we determine that Petitioner's conviction involves a crime of violence (and therefore is an aggravated felony), then we must dismiss his petition for lack of jurisdiction. *See Vargas–Sarmiento v. United States. Dep't of Justice,* 448 F.3d 159, 175, 2006 WL 1223105, at *14 (2d Cir. May 8, 2006); *Jobson,* 326 F.3d at 371.

### B. Statutory Background

■ An alien convicted of an "aggravated felony" after admission to the United States may be deported. *See* 8 ·U.S.C. § 1227(a)(2)(A)(iii). There are nearly two dozen aggravated felonies identified by Congress in the INA. *See* 8· U.S.C. § 1101(a)(43). One type of aggravated felony is a "crime of violence" for which the term of imprisonment is at least one year. *See id.* § 1101(a)(43)(F). The phrase "crime of violence" is in turn defined in Title 18 as either:

(a) an offense that has as an element the use, attempted use, or. threatened use of physical force against the person or property of another, or

(b) any other offense that is a felony and that, by its nature, involves a 'substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16. The parties agree that Petitioner's removal is based on section 16(b) and not on section 16(a), as the crime for which Petitioner was convicted does not have the use of force as one of its elements. Thus, our discussion focuses on the requirements of section 16(b).

"Section 16(b) sweeps more broadly than § 16(a)," *Leocal v. Ashcroft,* 543 U.S. 1, 10, 125· S.Ct. 377, 160 L.Ed.2d 271 (2004), but involves only two elements: (1) a criminal felony; (2) that, " 'by its nature,' involves a substantial risk that physical force" may be used. *Sutherland v. Reno,* 228 F.3d 171, 175 (2d Cir.2000). (quoting 18 U.S.C. § 16(b)). Here, Petitioner does not dispute that he was convicted of a felony. Rather, he claims that the felony of which he was convicted under CGS § 53a–167c(a)(1) did not, by its· nature, involve a substantial risk that physical force may be used.

Section 53a–167c(a)(1) provides in pertinent part: "A person is guilty of assault of [a] public safety [officer] . . . when, with intent to prevent a reasonably identifiable . . . officer . . . from performing his or her duties, and while such . . . officer . . . is acting in the performance of his or her duties, (1) such person causes. physical injury to such . . . officer . . . ."[2] CGS § 53a–167c(a)(1). Though the statute is entitled "Assault of public safety or emergency medical personnel," it provides a specific list of public safety employees who are covered under the statute. *Id.* The list starts with "peace officer[s]," but also includes many· other categories of public safety personnel, including, among others, firefighters, probation officers, and employees of the Department of Children and Families.[3] *Id.* Peace officer is defined elsewhere in the CGS as:

---

**2.** The CGS define "physical injury" as the "impairment of physical. condition or pain." CGS § 53a–3(3).

**3.** The full list is as follows:

peace officer, special· policeman . . . , firefighter or employee of an emergency medical service organization . . . , emergency room physician or nurse, employee of the Department of Correction, member or employee of the Board of Pardons and Paroles, probation officer, employee of the judicial branch assigned to provide pretrial secure detention and programming services to juveniles accused of the commission of a de-

a member of the Division of State Police ... or an organized local police department, a chief inspector or inspector in the Division of Criminal Justice, a state marshal while exercising authority granted under any provision of the general statutes, a judicial marshal ..., a conservation officer or special conservation officer, ... a constable who performs criminal law enforcement duties, a special policemen appointed under section 29–18, 29–18a or 29–19, an adult probation officer, an official of the Department of Correction authorized by the Commissioner of Correction to make arrests in a correctional institution or facility, any investigator in the investigations unit of the State Treasurer or any special agent of the federal government authorized to enforce the provisions of Title 21 of the United States Code.

CGS § 53a–3(9).

 "The statute is intended to protect peace officers in the performance of their duty." *State v. Woolcock,* 201 Conn. 605, 518 A.2d 1377, 1391 (1986); *see also State v. Nixon,* 231 Conn. 545, 651 A.2d 1264, 1270 (1995) (noting "expressed intent" of the revision adding correction officers was " 'to discourage those who would assault correctional employees' " (quoting remarks of Rep. William Kiner, reported at 33 H.R.Proc., Pt. 13, 1990 Sess., p. 4350)). Under Connecticut law, assault under CGS § 53a–167c(a)(1) is a specific intent crime. *See State v. Pagano,* 23 Conn.App. 447, 581 A.2d 1058, 1059 (1990); *State v. Flynn,* 14 Conn.App. 10, 539 A.2d

1005, 1011–12 (1988). The elements of this offense are: "(1) intent to prevent a reasonably identifiable peace officer from performing his duties; (2) the infliction of physical injury to the peace officer; and (3) the victim must be a peace officer." *State v. Turner,* 91 Conn.App. 17, 879 A.2d 471, 475 (2005) (citation omitted); *State v. Raymond,* 30 Conn.App. 606, 621 A.2d 755, 758 n. 4 (1993) (citation omitted).[4]

## C. Categorical Determination of a Crime of Violence

### 1. Guiding Principles

To determine whether an offense is a crime of violence under section 16(b), we must "look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime." *Leocal,* 543 U.S. at 7, 125 S.Ct. 377; *see also Taylor v. United States,* 495 U.S. 575, 600–03, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). This is the so-called "categorical approach," under which " 'only the minimum criminal conduct necessary to sustain a conviction under a given statute is relevant.' " *Dalton v. Ashcroft,* 257 F.3d 200, 204 (2d Cir.2001) (quoting *Michel v. INS,* 206 F.3d 253, 270 (2d Cir. 2000) (Calabresi, J., dissenting)).

"Where, however, a criminal statute encompasses diverse classes of criminal acts—some of which would categorically be grounds for removal and others of which would not—we have held that such statutes can be considered 'divisible' statutes." *Dickson v. Ashcroft,* 346 F.3d 44, 48 (2d Cir.2003) (citations omitted); *see also Dos*

---

linquent act, employee of the Department of Children and Families assigned to provide direct services to children and youth in the care or custody of the department, employee of a municipal police department assigned to provide security at the police department's lockup and holding facility or active individual member of a volunteer canine search and rescue team ....

CGS § 53a–167c(a).

**4.** One court has noted that a conviction under CGS § 53a–167c(a)(1) "requires proof of (1) intent to prevent (2) a reasonably identifiable officer (3) from performing his duty (4) by causing physical injury ...." *Flynn,* 539 A.2d at 1012 (citing § 53a–167c(a)(1) and (2)).

*Santos,* 440 F.3d at 84. In such a circumstance, while a court may not look to the particular facts of an alien's conduct to determine if the alien actually used force, *Jobson,* 326 F.3d at 371–72, a court may refer to the record of conviction to determine whether the alien's offense conduct falls within a category that would justify removal. *Kuhali v. Reno,* 266 F.3d 93, 106 (2d Cir.2001). "[T]he 'record of conviction' is statutorily defined as including, *inter alia,* the charging document, a plea agreement, a verdict or judgment of conviction, a record of the sentence, or a plea colloquy transcript." *Dickson,* 346 F.3d at 53 (citing 8 U.S.C. § 1229a(c)(3)(B)); *accord Abimbola v. Ashcroft,* 378 F.3d 173, 176–77 (2d Cir.2004) (identifying the record of conviction as including "the charging document, plea agreement, a verdict or judgment of conviction, and a record of the sentence or plea transcript"); *see also Valencia v. Gonzales,* 439 F.3d 1046, 1054 (9th Cir.2006) ("Under this 'modified' categorical approach, we examine documentation or judicially noticeable facts that clearly establish that the conviction is [an aggravated felony] [,] such as the indictment, the judgment of conviction, jury instructions, a signed guilty plea, or the transcript from the plea proceedings." (citations and quotations omitted) (alterations in original)); *Vue v. INS,* 92 F.3d 696, 700 (8th Cir.1996) (noting that "'immigration officers and courts, while precluded from considering the evidence, may examine the 'record of conviction' (including the indictment or information, plea, verdict or judgment and sentence) to determine the crime of which the alien actually was convicted'" (quoting *Wadman v. INS,* 329 F.2d 812, 814 (9th Cir.1964))).

### 2. Analysis

Under the categorical approach, we must determine if Petitioner's offense of conviction, by its nature, is a crime of violence. To make that determination, we first examine the statute under which Petitioner was convicted, here, CGS § 53a–167c(a)(1), to ascertain if it criminalizes conduct that can be described categorically as a crime of violence. As noted, this statute protects several categories of public safety officers and medical personnel from assault, which, aside from peace officers, includes employees of the Department of Correction, emergency room personnel, and active individual members of "volunteer canine search and rescue" teams. At oral argument, Petitioner contended that statutory inclusion of such classes of public safety officers, whom Petitioner expansively describes as "volunteer firefighters," "secretaries," "nurses," "doctors," "game wardens," and "dog catchers," requires the conclusion that CGS § 53a–167c(a)(1) does not identify a crime of violence under section 16(b), because preventing these categories of public safety officers from performing their lawful duties does not, by its nature, involve a risk that force will be used against them.

■ Even if Petitioner is correct—a question we do not decide on this appeal—he would only have succeeded in showing that the statute is divisible, requiring our inquiry to move to the record of conviction to identify the category of public safety officer in the statute that Petitioner was convicted of assaulting to determine if assaults against such officers, by their nature, involve a substantial risk that force may be used. *See Kuhali,* 266 F.3d at 106. Here, the record of conviction includes the transcript of Petitioner's *nolo contendere* plea, as well as the judgment of conviction.[5] While the judgment does not identify the category of public safety officer who

---

[5] For purposes of determining Petitioner's re- | movability, the fact that Petitioner's was a

was the victim of Petitioner's offense conduct, the transcript of the plea makes clear that Petitioner was charged with, and ultimately convicted of, assaulting a police officer who had pulled over Petitioner after observing him driving erratically. Thus, there is no question that the offense conduct for which Petitioner was convicted only involved a police officer, a category of public safety employee specifically protected by CGS § 53a–167c(a)(1).

While Petitioner does not contest our authority to consider the judicial record to determine the offense of conviction where a statute is divisible, he suggests (for the first time during oral argument) that because CGS § 53a–167c(a)(1) does not delineate the various categories of public safety employees covered in the statue in separate subsections, the statute cannot be cleanly divided between conduct that is categorically a crime of violence and conduct that is not categorically a crime of violence. We find this argument unpersuasive.

To begin, Petitioner cites no authority, and we are unaware of any, supporting his assertion that a statute is divisible only if the categories of conduct are in discrete "subsections." Indeed, we have on several occasions been able to carve out categories of offense conduct from divisible statutes

that we held were crimes of violence, even in the absence of enumerated subsections. For example, in *Sui v. INS,* 250 F.3d 105, 117–18 (2d Cir.2001), we treated the listed categories of "mak[ing], utter[ing] or possess[ing] a counterfeited security," under 18 U.S.C. § 513(a), as divisible, even though they were listed sequentially and not in separate subsections. Similarly, in *Dickson,* we found that New York Penal Law sections 135.10, 135.00(1), which generally prohibit the "unlawful imprisonment" of others, to involve a crime of violence when the offender imprisoned a competent adult, but not of an incompetent person or a minor under the age of sixteen. 346 F.3d at 49–52; *see also Valansi v. Ashcroft,* 278 F.3d 203, 210–14 (3d Cir. 2002) (holding 18 U.S.C. § 656, which prohibits embezzlement by a bank employee, is a divisible statute that covers embezzlement with either intent to injure or intent to defraud, even though the statute on its face does not distinguish between the two, because the caselaw applying the statute distinguishes the two in defining the elements of the crime).

Moreover, even though each of the categories of public officials protected by CGS § 53a–167c(a)(1) is not given its own subsection, Petitioner has offered no reason why the mere listing of these clearly defined categories does not allow a court to

---

*nolo contendere* plea, instead of a guilty plea, is of no import. *See* 8 U.S.C. § 1101(a)(48)(A). "Literally nolo contendere means 'I will not contest it,'" and "has the same effect as a plea of guilty." 1A Charles Alan Wright, *Federal Practice and Procedure* § 177, at 286 (3d ed.1999). Under the INA, the term "conviction" is defined as "a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where … the alien has entered *a plea of guilty or nolo contendere* … and … the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed." 8 U.S.C. § 1101(a)(48)(A) (emphasis added). This statutory language

makes clear that a plea of *nolo contendere,* like a guilty plea, is a "conviction" for purposes of determining whether an alien has been "convicted" of an aggravated felony within the meaning of 8 U.S.C. § 1227(a)(2)(A)(iii). *See Abimbola,* 378 F.3d at 177 (noting that "[t]he inclusion of nolo contendere pleas in the statute … reflects that Congress focused the sanction of removal on a criminal conviction as opposed to an admission of guilt"); *see also United States ex rel. Bruno v. Reimer,* 98 F.2d 92, 92–93 (2d Cir.1938) (per curiam) (holding alien deportable based on two prior convictions, one pursuant to a *nolo contendere* plea, for crimes of moral turpitude).

distinguish among them for these purposes. In other words, CGS § 53a–167c(a)(1) does not proscribe assault generally against "public safety officers," and then leave the classification of the subgroups of public safety officers covered by the statute to a regulating agency or the courts to determine. Instead, the various categories of public safety officers protected by the statute are listed sequentially, each separated by a comma, and are phrased in the disjunctive. *See* CGS § 53a–167c(a) ("peace officer, special policeman appointed under section 29–18b, ... *or* active individual member of a volunteer canine search and rescue team ...." (emphasis added)). "Since any statute that is phrased in the disjunctive can be readily converted to outline form, it would be strange to think that Congress intended the application of the categorical approach to turn on the typography used by the statute's drafters." *Singh v. Ashcroft*, 383 F.3d 144, 163 (3d Cir.2004). Indeed, Connecticut courts have encountered little difficulty in distinguishing between the categories listed in CGS § 53a–167c(a)(1). *See, e.g., State v. Salters*, 78 Conn.App. 1, 826 A.2d 202, 207 n. 5 (2003) ("[T]here exists a distinction between a peace officer and a correctional officer as seen by the fact that General Statutes § 53a–167c(a) separately lists peace officer and employee of the department of corrections."). Therefore, CGS § 53a–167c(a)(1) is a divisible statute in that a court may look to the record of conviction for the limited purpose of determining which public safety employee was the subject of any assault, thereby permitting it to determine whether the alien's conviction was under a section of the statute that permits removal. *See Dickson*, 346 F.3d at 48–49.

We further conclude that Petitioner's offense of conviction—assault of a police officer under CGS § 53a–167c(a)(1)—is a crime of violence under section 16(b) because it inescapably involves a "substantial risk that physical force ... may be used" in the commission of the crime. 18 U.S.C. § 16(b). In reaching this conclusion we, of course, do not consider the fact that Petitioner used force in this case, or that a person could theoretically violate CGS § 53a–167c(a)(1) without using force. Instead, the Supreme Court has made clear that, under section 16(b), we must consider whether the offense "naturally involve[s] a person acting in disregard of the risk that physical force might be used against another in committing [the] offense." *Leocal*, 543 U.S. at 10, 125 S.Ct. 377; *see also Vargas–Sarmiento*, 448 F.3d at 169, 2006 WL 1223105, at *8 ("The critical categorical inquiry is whether, inherent in any commission of the felony is 'a substantial risk' that the perpetrator 'may' use such force." (citing *Leocal*, 543 U.S. at 10, 125 S.Ct. 377)).

To be convicted of assaulting a police officer under CGS § 53a–167c(a)(1), the offender must injure an officer while *intentionally* preventing the officer from performing his or her official duties. What this means in real terms is, among other things, preventing law enforcement officers from apprehending and arresting suspected criminals, carrying out lawful searches and seizures, intervening in personal disputes, and other duties that routinely involve physical intervention by police officers. Indeed, the typical offender under CGS § 53a–167c(a)(1) is the subject of, or sympathetic to the subject of, the police officer's actions. Thus, it is unsurprising that the reported cases relating to convictions under CGS § 53a–167c(a)(1) entail intentional force and, indeed, violent force directed at police officers by those being investigated, questioned, or apprehended by police officers. *See, e.g., State v. Smith*, 275 Conn. 205, 881 A.2d 160, 170 (2005) (defendant convicted of violating

CGS § 53a–167c(a)(1) after fighting with officers seeking to question defendant about murder); *State v. Casanova,* 255 Conn. 581, 767 A.2d 1189, 1193–94 (2001), *abrogated on other grounds by State v. Brocuglio,* 264 Conn. 778, 826 A.2d 145, 156 (2003) (defendant struck police officer attempting to take defendant into custody); *State v. Ortiz,* 79 Conn.App. 667, 830 A.2d 802, 805 (2003) (defendant shot arresting police officers); *State v. Madagoski,* 59 Conn.App. 394, 757 A.2d 47, 50 (2000) (defendant, in facts strikingly similar to those presented in this case, injured police officer while attempting to drive away in van).

Further, because assault of a police officer under CGS § 53a–167c(a)(1) is a specific intent crime, it is categorically different than other offense conduct found not to qualify as a crime of violence because such conduct involves only negligent or reckless conduct.[6] For example, the Supreme Court has held that drunk driving, though it might have violent consequences, is not a crime of violence because the "risk that an accident may occur when an individual drives while intoxicated is simply not the same thing as the risk that the individual may 'use' physical force against another in committing the DUI offense." *Leocal,* 543 U.S. at 10 n. 7, 125 S.Ct. 377; *accord Dalton,* 257 F.3d at 205–08 (holding that driving while intoxicated under New York law is not a crime of violence). Similarly, we have held that second degree manslaughter under New York Penal Law § 125.15(1), which merely requires the offender to "recklessly cause[ ] the death of another person," *Jobson,* 326 F.3d at 372 (citing N.Y. Penal Law § 125.15(1)), is not a crime of violence because it includes

"passive conduct or omissions" which result in death, and, therefore, the statute "encompasses many situations in which the defendant applies no physical force to the victim, and more importantly, situations that do not involve any risk that the defendant will apply force to the victim." *Id.* at 373. In reaching this result, we noted our belief, later echoed by the Supreme Court in *Leocal,* that "a predicate offense cannot satisfy the . . . requirements of section 16(b) without requiring some intentional conduct. On this view, a defendant must, in pursuing his intended criminal activity, risk having to intentionally use force to commit the offense." *Id.* at 374 (citation omitted).

Thus, where the criminal statute at issue requires intentional conduct, even if force (let alone violent force) will not always be required to commit the crime, we have not hesitated to find the offense to be a crime of violence, as long as there is an inherent risk that force might be used to commit the crime. For example, in *Chery v. Ashcroft,* 347 F.3d 404 (2d Cir.2003), we held that the mere possibility that a minor could not consent to sexual intercourse meant that there was an inherent risk that force might be used to violate a Connecticut statute, CGS § 53a–71, proscribing sexual intercourse with, among others, minors between the ages of 13 and 16 (where the defendant is at least 2 years older) and those mentally incapacitated and unable to consent. What we said to distinguish the statute in that case from the manslaughter statute at issue in *Jobson* applies with equal force here: "The Connecticut statute at issue here is distinguishable . . . in that a conviction requires *affirmative* conduct

---

**6.** The Connecticut courts have held that reckless endangerment under CGS § 53a–64 is not a lesser included offense of assault of a peace officer under CGS § 53a–167c(a)(1). *See Flynn,* 539 A.2d at 1011–12 (emphasizing

"intentionally and recklessness are two distinct states of mind" thus, no double jeopardy bar to prosecution for both offenses (quotations and citations omitted)).

by the defendant ...." *Chery,* 347 F.3d at 407.[7] Similarly, in *Dickson,* we held that unlawful imprisonment of a competent adult under New York Penal Law was a crime of violence, even if done only by deception of the adult victim. 346 F.3d at 49–51. In so holding, we acknowledged that force would not always be used to unlawfully imprison an adult, but we nonetheless found that the risk of using force was inherent in the nature of the crime. *Id.* at 51.

These decisions flow directly from well-established authority recognizing offenses such as burglary and prison escape as violent crimes. Indeed, the Supreme Court has noted that burglary is a "classic example" of a crime of violence under § 16(b), because "by [its] nature, [it] involves a substantial risk that the burglar will use force against a victim in completing the crime." *Leocal,* 543 U.S. at 10, 125 S.Ct. 377; *see also Jobson,* 326 F.3d at 373 (noting that a burglar " '*risks having to use force* if the occupants are home and hear the burglar' " (quoting *United States v. Parson,* 955 F.2d 858, 866 (3d Cir.1992)) (emphasis in *Jobson* )). This is so even though a burglar can commit the crime by "entering through a wide-open door when no one is inside." *Chery,* 347 F.3d at 408 (citing *Jobson,* 326 F.3d at 373).

Similar to burglary, the courts have regularly found that the crime of prison escape involves the inherent risk of violence, even if the escapee is able to flee the prison without detection. *See, e.g., United States v. Gay,* 251 F.3d 950, 955 (11th Cir.2001) (per curiam) (holding escape is a crime of violence under U.S.S.G. § 4B1.2(a) because escape presents "the

potential risk of violence, even when it involves a 'walk-away' from unsecured correctional facilities"); *United States v. Nation,* 243 F.3d 467, 472 (8th Cir.2001) ("Even the most peaceful escape cannot eliminate the potential for violent conflict when the authorities attempt to recapture the escapee. Given this reality, we have no difficulty in concluding that escape qualifies as a crime of violence ...."). Specifically, prison escape by stealth is recognized as a crime of violence principally due to the obvious risk that an inmate might be pursued by law enforcement officers and seek to prevent apprehension through the use of force. As the Tenth Circuit expounded:

> [E]very escape scenario is a powder keg, which may or may not explode into violence and result in physical injury to someone at any given time, but which always has the serious *potential* to do so. A defendant who escapes from jail is likely to possess a variety of supercharged emotions, and in evading those trying to recapture him, may feel threatened by police officers, ordinary citizens, or even fellow escapees. Consequently, violence could erupt at any time. Indeed, even in a case where a defendant escapes from a jail by stealth and injures no one in the process, there is still a serious potential risk that injury will result when officers find the defendant and attempt to place him in custody.

*United States v. Gosling,* 39 F.3d 1140, 1142 (10th Cir.1994) (citation omitted); *see also United States v. Jackson,* 301 F.3d 59, 63 (2d Cir.2002) (holding that escape convictions are a violent felony under 18

---

7. We recently applied the same reasoning to find a crime of violence under a Connecticut statute making it a felony for any person to have "contact with the intimate parts ... of a child under the age of sixteen years" or to subject a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child. *See Dos Santos,* 440 F.3d at 83–86 (quoting CGS § 53–21(a)(2)).

U.S.C. § 924(e) because escape "invites pursuit; and the pursuit, confrontation, and recapture of the escapee entail serious risks of physical injury to law enforcement officers and the public"); *United States v. Hairston*, 71 F.3d 115, 118 (4th Cir.1995) (holding escape is a "violent felony" under 18 U.S.C. § 924(e)(2)(B), and noting that an escapee, facing possible "interference" with his flight, "may choose to dispel the interference by means of physical force").[8] Yet, this prison-escape scenario is but one species of the type of confrontation involving a law enforcement officer which is covered by CGS § 53a–167c(a)(1) and which makes Petitioner's offense conduct a crime of violence under section 16(b). Of course, not every violation of CGS § 53a–167c(a)(1) involving police officers will involve the emotionally charged confrontation between a prison escapee and a pursuing peace officer. Nonetheless, it is manifestly clear that intentionally preventing a police officer from carrying out his or her duties, particularly where injury results, always presents a substantial risk that the defendant may intentionally use force in committing the crime.[9] *See Dickson*, 346 F.3d at 51.

Petitioner contests this conclusion, arguing that it is not necessary that the offender use force to interfere with the performance of an officer's duties, even if the officer ultimately is injured. In support of this claim, Petitioner offers two hypothetical examples where, in his view, an offender could be convicted of assault under CGS § 53a–167c(a)(1) without using any force against a police officer. The first example involves a defendant "plac[ing] a hazardous object in the way of the officer that causes injury." In his second example, Petitioner hypothesizes a scenario where a person could intend to prevent the officer from carrying out their duties by offering a bribe, or generally talking to the officer. In this scenario, if, "because of the anxiety to achieve this goal[,] one inadvertently left the car in neutral on a hill and it rolled back hurting the officer," the injury would be unintentional and not the result of any force.

Neither hypothetical scenario undercuts the conclusion that assaulting a police officer, as defined in CGS § 53a–167c(a)(1), inherently presents a substantial risk that force may be used. The first scenario, the intentional placement of a hazardous (or any) object in the way of a police officer, would, in fact, constitute an intentional use of "force." As we have previously observed, force is broadly defined to include "[p]ower, violence, or pressure directed against a person or thing." *Chrzanoski v. Ashcroft*, 327 F.3d 188, 192 (2d Cir.2003) (quoting *Black's Law Dictionary* 656 (7th ed.1999) (alteration in *Chrzanoski*)). Under this broad definition, we have found

---

8. We fully recognize that these decisions categorize prison escape as a crime of violence under 18 U.S.C. § 924(e)(2)(B) and the U.S. Sentencing Guidelines Manual § 4B1.2(a), both provisions that, unlike Section 16, define a crime of violence as involving the risk that injury will result (and not that force will be used) during commission of the crime. However, as is clear from these decisions, the risk of injury during a prison escape derives from the inherent possibility that the prisoner will use force to prevent law enforcement officers from apprehending the escapee and returning him to prison.

9. As noted, we are aware that section 16(b) entails only the risk that force will intentionally be used as part of the crime, and not on the mere possibility that injury will result from commission of the crime. Thus, there should be no doubt that while CGS § 53a–167c(a)(1) requires as one of its elements that injury to a peace officer result from the intentional interference of the officer in the performance of that officer's duties, we do not base our holding merely on the existence of that element.

that a defendant who merely locks a door (after luring the victim into a room) in committing the crime of unlawful imprisonment has used force, and, therefore, has committed a crime of violence. *See Dickson*, 346 F.3d at 49; *Vargas–Sarmiento*, 448 F.3d 159, at 174, 2006 WL 1223105, at *13 (noting risk of physical force referenced by section 16(b) includes deliberately setting in motion a chain of events specifically intended to avail oneself of the forceful physical properties of an agent (whether human or not)). Thus, this scenario merely reinforces our conclusion that assaulting a police officer, even without using violent force, always involves a substantial risk that *some* force may be used.

Under the second scenario, discussing a bribe with the officer, it is far from clear that CGS § 53a–167c(a)(1) would be violated by such conduct. "The purpose of § 53a–167c(a) is to prevent and punish *injurious* behavior intended to interfere with public servants[ ] performing their duties." *State v. Dunbar*, 37 Conn.App. 338, 656 A.2d 672, 676 (1995) (emphasis added). On this score, it is important to note that Connecticut courts have held that assault of a peace officer under CGS § 53a–167c(a)(1) is the greater offense of interfering with a peace officer under CGS § 53a–167a(a), which prohibits "obstruct[ing], resist[ing], hinder[ing] or endanger[ing] any peace officer or fireman in the performance of his duties." *Flynn*, 539 A.2d at 1010–11. Thus, "a person could not commit the greater offense of assault on a peace officer without having committed the lesser offense of interfering with a peace officer." *Id.* at 1011. Given this interpretation of the statute by Con-

necticut courts, it seems clear that mere discussion of a bribe, or any other peaceful conversation between a suspect and a police officer, is not remotely the type of conduct the Connecticut legislature envisioned it was proscribing when it criminalized assault of peace officers. Simply put, bribery could not be said to interfere with, or prevent, the performance of the police officer's duties through the injurious conduct prohibited under Connecticut law, but rather, is more properly viewed as an effort to corruptly influence the officer to violate his official duties, thus placing Petitioner's creative scenario of the bribed officer outside the confines of CGS § 53a–167c(a)(1). *Cf. Salters*, 826 A.2d at 206 (noting that as a necessary element of assault of a peace officer under CGS § 53a–167c "the state must prove beyond a reasonable doubt that the officer was acting in the performance of his duties").[10]

In any event, "[i]t is immaterial that one may imagine various scenarios that violate a statute, yet the perpetrator's conduct does not create a genuine probability that force will be used. What matters is that the *risk* of force is inherent in the offense." *Dos Santos*, 440 F.3d at 84 (citations omitted); *see also Dickson*, 346 F.3d at 51 (rejecting argument that "even one ... implausible, but not, perhaps, impossible scenario" where crime could be committed without use of force would compel the Court to conclude under the categorical approach that unlawful imprisonment is not a crime of violence under section 16); *Chery*, 347 F.3d at 408 ("Doubtless, cases can be imagined where a defendant's conduct does not create a genuine probability

**10.** In Connecticut, bribery of a police officer is prohibited under CGS §§ 53a–147 to 148. The elements of bribery as stated in CGS § 53a–147 are: (1) offering, conferring, or agreeing to confer a benefit (2) upon a public servant (3) as consideration for the recipient's decision, opinion, recommendation or vote as a public servant. CGS § 53a–147; *see also State v. Carr*, 172 Conn. 458, 374 A.2d 1107, 1112 (1977) (citing 1977 version of § 53a–147).

that force will be used, but the risk of force remains inherent in the offense."). Thus, the bribery scenario, which Petitioner has not substantiated by citation to any case where a person was convicted for such conduct under CGS § 53a–167c(a)(1), is simply too remote to alter our view that a person who (1) with intent to prevent a reasonable identifiable police officer from performing his or her duties, (2) causes physical injury to that officer, commits a felony that, by its nature, involves a substantial risk that physical force may be used.

## CONCLUSION

For the foregoing reasons, we hold that Petitioner's conviction for assaulting a peace officer, in violation of CGS § 53a–167c(a)(1), constitutes a "crime of violence" under 18 U.S.C. § 16(b), thus permitting removal of Petitioner as an aggravated felon within 8 U.S.C. § 1227(a)(2)(A)(iii). Accordingly, because we lack jurisdiction to further review the order of removal in this case, Canada's petition is hereby DISMISSED.